IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Sabrina S. Anderson, | ) | C/A No. 3:24-5256-SAL-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| v. | ) | **AND** |
| | ) | **REPORT AND RECOMMENDATION** |
| Quartz Logistics, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The self-represented plaintiff, Sabrina S. Anderson, sued her former employer, Defendant

Quartz Logistics, Inc. ("Quartz"), for alleged violations of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §§ 2000e, et seq.; including claims of retaliation, hostile work

environment, disparate treatment, and discriminatory discharge.  She also asserts claims of

employment discrimination pursuant to 42 U.S.C. § 1981.  This matter is before the court pursuant

to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and

Recommendation on the parties' cross motions for summary judgment (ECF Nos. 104, 105).[1]  This

matter is fully briefed and ready for resolution.  (ECF Nos. 110, 113, & 114.)  Having reviewed

the parties' submissions and the applicable law, the court recommends that Anderson's motion be

denied and Quartz's motion be granted.

## BACKGROUND

The following facts are either undisputed or are taken in the light most favorable to the

nonmoving party, to the extent they find support in the record.  Quartz is "a logistics company

---

[1] After Quartz filed its motion for summary judgment, Anderson was advised pursuant to
Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), of the summary judgment and dismissal
procedures and the possible consequences if she failed to respond adequately to the defendant's
motion.  (ECF No. 107.)

operating from Columbia, [South Carolina,] that provides all-in-one freight transportation and warehousing services." (Jiang Decl. ¶ 3, ECF No. 105-1 at 1.) Anderson, an African-American female, began working for Quartz in April 2022 as a customer service or logistics coordinator. She was supervised by RongMei Jiang, known to employees at Quartz as Shirley Tolbert and Shirley Jiang ("Tolbert"). Tolbert reported to Daniel Wang, the President of Quartz. Accounting Manager Sandy Chen—who also performed some of the human resources functions and was the individual that Anderson and Tolbert often consulted on human resource issues[2]—issued Anderson an offer letter after Anderson interviewed with Tolbert. During Anderson's employment with Quartz, Tolbert also supervised Kendhall LeBron, Federica Brantmeier, Alex Li, and Chris Docos. Employees of Quartz received a base salary and could receive quarterly bonuses generally following their probationary period. There is no specific formula for these bonuses; rather, the amount is decided by Wang and Chen after consulting with an employee's supervisor.

The following timeline summarizes the alleged events that are pertinent to claims before the court:

| Date | Description |
| --- | --- |
| April 2022 | Anderson began her employment. |
| July 19, 2022 | Tolbert reprimanded Anderson for a mistake regarding delivery locations and asked for Anderson's plan to improve.[3] |
| October 20, 2022 | Anderson received her first bonus in the amount of $1,000. |
| January 19, 2023 | Anderson incorrectly revised a customer's rate, resulting in overbilling, which she attributed to the broker who provided that rate. |
| January 26-27, 2023 | Anderson received her second bonus in the amount of $2,000. Anderson emailed Chen questioning the bonus structure. |
| February 7, 2023 | Anderson messaged Tolbert indicating Anderson would like to speak to Wang and Human Resources staff. |

---

[2] The record indicates that Kelly Chueh was also an Accounting Manager whom the parties occasionally contacted.

[3] Anderson asserts that this mistake was not solely hers, characterizing it as a "team mistake."

| February 8, 2023 | Anderson sent the wrong customer a shipment notification. On February 10, 2023, Tolbert issued Anderson a verbal warning for this error. Anderson attributes this error to the alleged hostile work environment. |
| --- | --- |
| February 9, 2023 | Tolbert arranged for an exception for Anderson to take a paid day of vacation when she had insufficient leave available. |
| March 17, 2023 | Tolbert reported to Human Resources that Anderson erred in booking a full truck for one pallet costing Quartz $150. Tolbert inquired about a performance improvement plan for Anderson. Anderson questioned why only her mistakes were being reported to Human Resources and advised that she would speak directly to Human Resources. |
| | Tolbert emailed Human Resources reporting that Anderson left work at 11:18 a.m. without submitting a leave request.[4] She further reported that Anderson was mad at her co-worker Brantmeier and "took it out on everyone else in the office." (ECF No. 113-2.) |
| March 20, 2023 | Tolbert emailed Anderson about Anderson's leaving work at 11:18 a.m. on March 17, 2023 (rather than the 1:00 p.m. departure time that had been approved) without submitting leave approval for an earlier departure and indicated that Anderson "walked away" from work again on March 20, 2023. |
| | Tolbert emailed Human Resources that Tolbert was advised that Anderson arrived to work mad that Tolbert reported the booking error to Human Resources on the 17th. Due to Anderson's "temper tantrum" and inability to work, Tolbert sent Anderson home. |
| | Anderson messaged Tolbert indicating that she felt discriminated against. Tolbert responded that Anderson's work attitude had been escalated to Human Resources, provided Anderson with Quartz Vice Present Jennifer Chou's contact information, and stated that Anderson "walked away" from work on the 17th. |
| | Anderson emailed Chou and Chen reporting numerous issues with Tolbert regarding Anderson's bonuses, Anderson's departure from work on the 17th, Tolbert's discussing Anderson in front of co-workers, Tolbert's reporting only Anderson to Human Resources, and Anderson's general feelings of hostility and discrimination. |
| April 25, 2023 | Anderson sent the wrong invoice to a customer containing confidential customer information. Tolbert informed Anderson that this was unacceptable. |
| | Anderson returned from a doctor's appointment and inquired whether Quartz had a mental health policy. Tolbert forwarded her email to Chen. Chen informed Anderson that, due to the size of the company, Quartz was not covered by the FMLA and was unable to offer her additional time off. |

---

[4] Anderson submitted this email as evidence, but questions its accuracy based on the time stamp indicating it was sent at 9:24 a.m. Quartz explains that the time stamp is based on the recipient's California time zone, which is three hours behind South Carolina's.

| | |
|---|---|
| July 19, 2023 | Anderson left work early, was treated in the emergency department, and provided a doctor's note indicating that she could return to work on July 21, 2023. |
| July 21, 2023 | Anderson received her third bonus in the amount of $3,000. |
| July 26, 2023 | Emails were exchanged between Anderson, Tolbert, Chueh, and Chen. Anderson sent an email stating she would be absent on July 27 for a medical appointment for her hypertension, which she attributed to the alleged hostile work environment. Tolbert responded that she had noticed Anderson in and out of the office two-to-four times every hour for a few weeks. Anderson pointed out Tolbert's own absences from the office and requested that Tolbert specify where Anderson's job was not being completed. Anderson also asked for assistance, accused Tolbert of retaliating by bringing up and documenting issues with Anderson's work performance, and generally complained of morale due to Tolbert's unprofessionalism. Tolbert responded and detailed several of Anderson's mistakes during July and their impact on the company and issued Anderson a verbal warning. |
| July 27, 2023 | Anderson was absent but spoke with Chen earlier in the day and was advised that Chen would schedule a meeting between Anderson and Tolbert to discuss the retaliation reported on July 26. Anderson was treated at Urgent Care that day and provided an excuse indicating she could return to work on July 29, 2023. |
| July 28, 2023 | Anderson reported to work expecting to meet with Chen. Instead, Anderson met with Tolbert, who placed her on a performance improvement plan ("PIP") which indicated that her work would be closely monitored for the next thirty days and required improvement in attendance, attention to detail, and insubordination. |
| August 4, 2023 | Anderson emailed Chueh questioning the inclusion of attendance in her PIP when her leave record showed her only unpaid absences were covered under doctors' excuses (July 20 and July 27). |
| October 20, 2023 | Anderson received her fourth bonus in the amount of $2,000. |
| December 6, 2023 | Anderson was provided a copy of the Revised Employee Handbook ("Revised Handbook"), which was revised on March 15, 2023. |
| December 29, 2023 | Chueh emailed the employees stating that every employee was required to review the Revised Handbook and instructed everyone to sign the Revised Handbook by January 4, 2024. |
| January 2, 2024 | Anderson contacted Tolbert requesting that she open the back door of the office building for her. After Tolbert let her in, Tolbert sent an email to the entire team reminding them not to use the back door without written authorization. |
| | Tolbert emailed Anderson instructing her to review and sign the attached Non-Disclosure Agreement ("NDA") by January 4, 2024. Chen emailed Anderson again instructing her to sign page 45 of the Revised Handbook no later than January 4, 2024. Anderson responded that the Revised Handbook did not apply to her due to the retaliation she had experienced. |

| January 3, 2024 | After seeing two co-workers use the back door, Anderson emailed Tolbert reporting their use, inquiring essentially if the policy only applied to her or all Quartz employees, and accusing Tolbert of creating a hostile work environment.[5] Tolbert emailed the employees who used the back door indicating she had received a complaint, reminding them not to use the back door (and in LeBron's case, demanding to know why she used the back door after already having been instructed not to), and including the body of Anderson's email without any of Anderson's identifiers. Anderson stated that it resulted in those employees confronting her. |
|---|---|
| January 4, 2024 | Anderson emailed Chen, Chou, Wang, and Tolbert reporting allegations of retaliation and hostile work environment. She referenced the email regarding the back door policy after Anderson used the back door, her email being forwarded to her co-workers the next day, and her PIP having been issued soon after reporting Tolbert's unprofessional behavior. |
| January 4, 2024 | Tolbert emailed Chen, Wang, and Chueh responding to Anderson's allegations. |
| January 8, 2024 | Anderson requested leave from Tolbert to work remotely the next day due to inclement weather. Tolbert advised Anderson to contact Human Resources. The response from Human Resources was that the office would remain open. |
| January 9, 2024 | Anderson left the office at noon after notifying Chen, Wang, Chou, and Tolbert. Anderson alleges that sometime thereafter Tolbert sent a group chat message stating that employees could work from home for the rest of the day. Anderson responded that she had already left without her work computer. After being asked if she had approval, Anderson responded that she left for her safety and did not need approval. Tolbert stated that this was considered work abandonment, to which Anderson accused Tolbert at length of creating a hostile work environment. Tolbert requested contact information for a lawyer Anderson had mentioned in July. |
| January 10, 2024 | After emailing Tolbert about the events of the previous day, Anderson emailed Wang to request intervention in Tolbert's creation of a hostile work environment. Wang responded requesting to speak with her on January 12. |
| January 12, 2024 | Anderson emailed Wang to confirm the time of their meeting since inclement weather in the area may result in her leaving early. She stated her belief of discrimination and retaliation based on her race/color and mentioned that she made prior reports. |

---

[5] The record reveals that on December 29, 2023, Tolbert personally spoke with LeBron, one of the two co-workers, and informed her that use of the back door was not permitted.

| | At 4:45 p.m. that afternoon, Wang asked Anderson to join him in the conference room where Wang asked Anderson why she had not signed the Revised Handbook or the NDA. There is a dispute as to whether Anderson ultimately agreed to sign the NDA; however, Wang informed Anderson that if she did not sign the Revised Handbook she would be terminated. Anderson refused to sign it. After Wang made a phone call, Tolbert and Brantmeier entered the room with Anderson's letter of termination. Wang again asked her to sign the documents and Anderson refused. Anderson was then terminated for the stated reasons of failing to sign the Revised Handbook and the NDA. |
|---|---|

Anderson filed this action alleging that Quartz discriminated against her based on both her race and her color, permitted a hostile work environment, and retaliated against her.

## DISCUSSION

### A.     Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*." Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (internal quotation marks and citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor.  Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002).  The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms.  See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

**B.     Methods of Proof in Title VII Cases**

A plaintiff asserting a claim of unlawful employment discrimination pursuant to Title VII may proceed through two avenues of proof.  First, she may attempt directly to prove discrimination with direct or circumstantial evidence.  Alternatively, when direct proof is lacking, a plaintiff may proceed under the McDonnell Douglas burden-shifting framework.  See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) ("This framework was initially developed for Title VII discrimination cases . . . but has since been held to apply in discrimination cases arising under § 1981 . . . and in retaliation cases under both statutes.") (internal citations omitted).  Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action.  Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII).  The defendant's burden "is a burden of

production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks and citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[], but [was] a pretext for discrimination." Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is

false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

### C.    Analysis

#### 1.    Initial Issues

A couple of threshold issues demand resolution before turning to the parties' motions for summary judgment.

**Discovery production.**  First, Anderson repeatedly objects to Quartz's reliance on any documents that were produced to her in discovery on June 20, 2025—the discovery deadline. Anderson's argument that producing these documents after her deposition somehow makes the production improper is unavailing.  Further, her reliance on Federal Rule of Civil Procedure 37(c)(1) in support of sanctions is misplaced, as these documents were timely produced. Moreover, although Anderson appears to suggest that this production on the deadline prevented her from being able to engage in additional discovery, she has failed to demonstrate what additional discovery was needed.  Nor did Anderson move to extend the discovery deadline.  Instead, she moved to exclude the discovery production, arguing that the supplemental production on the discovery deadline was untimely. (ECF No. 93.)  Because the defendant's discovery was properly and timely produced, Plaintiff's motion is denied.  The court will therefore consider these documents in addressing the parties' dispositive motions.

**Use of generative AI.**  Additionally, as observed by Quartz, many of Anderson's filings contain a misstatement of the legal authority cited, do not support the propositions they are cited

for, or do not appear to even exist. (See Def.'s Reply to Def.'s Mot. Summ. J. at 1, ECF No. 114 at 1.) Anderson is self-represented, and it is unclear whether these errors resulted from the use of a generative Artificial-Intelligence ("AI") tool. The court takes this opportunity to caution both parties if they elect to use generative AI to assist in drafting any document filed with the court. In their current state, many AI platforms are prone to hallucinations and bias. Accordingly, any language generated by AI must be verified for accuracy by a human being. The use of AI without verification of the accuracy of its output implicates Rule 11 of the Federal Rules of Civil Procedure, which serves, in part, to deter frivolous, improper, and baseless filings through the imposition of sanctions. Rule 11 applies to the attorney of record whose signature is on the document, or by a party personally if the party is unrepresented. All parties are hereby informed of the court's zero-tolerance policy for citations to non-existent cases, hallucinations of legal propositions, or unreasonable misstatements of the law—whether or not AI was used in the drafting process. Any such filings are subject to sanctions including, but not limited to, the filing being stricken from the docket, monetary sanctions, or dismissal of the lawsuit.

### 2.    Motions for Summary Judgment

Turning to the merits of the parties' cross-motions for summary judgment, as stated above, Anderson alleges that Quartz discriminated against her based on both her race and her color, permitted a hostile work environment, and retaliated against her. Plaintiff directs the court to numerous events and occurrences during her employment and her ultimate termination that she believes were unlawful; however, her motion for summary judgment and her response in opposition to summary judgment appear to focus on the following:

- a lower bonus payment than another employee;
- Tolbert's documenting Anderson's mistakes and reporting issues with Anderson to Human Resources;

- the handling of Anderson's use of the back door and Anderon's email questioning others' use; and

- Anderson's termination.

It is not clear if Anderson is attempting to rely on all of these alleged adverse acts for each type of discrimination claim. Therefore, out of an abundance of caution, the court has considered all of them in addressing each type of claim.

Having carefully reviewed the parties' filings and the record and, for the reasons discussed below, the court finds that even viewing all of the facts in the light most favorable to Anderson, no reasonable jury could find for Anderson on any of her claims. Accordingly, Quartz's motions for summary judgment should be granted and Anderson's motion for summary judgment should be denied.

### a.     Color Discrimination

A claim of color discrimination is distinct from a claim of race discrimination. "Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual." Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 n.5 (4th Cir. 2002). Anderson reiterates that she was the only Black or African-American employee supervised by Tolbert during Anderson's employment. However, as argued by Quartz, the record is devoid of any evidence that any of the actions taken by Quartz were motivated by Anderson's skin tone. Anderson has not responded to this argument, nor has she advanced any basis that she would be entitled to summary judgment on any color-based claim. Accordingly, Quartz is entitled to summary judgment on Anderson's color discrimination claims.

> **b.     Race Discrimination[6] and Retaliation**
>
> **i.     *Prima Facie* Test (Race Discrimination).**

Generally, a plaintiff can demonstrate a *prima facie* test of disparate treatment by showing: (1) the plaintiff is a member of a protected class; (2) she suffered an adverse employment action, (3) she was performing satisfactorily at the time of the adverse employment action, and (4) the circumstances suggest an unlawfully discriminatory motive.[7]  See, e.g., Noonan v. Consol. Shoe Co., Inc., 84 F.4th 566, 572 (4th Cir. 2023) (Title VII, pay disparity); Freeman v. N. State Bank, 282 F. App'x 211, 216 (4th Cir. 2008) (Title VII & § 1981, bonus disparity).  In the specific context of an alleged discriminatory discharge, a plaintiff typically must show that:  (1) she is a member of a protected class; (2) she was fired; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.[8] Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005) (Title VII) (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)).

To the extent Anderson is raising a discrete discrimination claim, Quartz does not appear to challenge Anderson's ability to meet the second element of the *prima facie* test as to her

---

[6] Although Anderson repeatedly indicates that she is raising a claim for discrimination, her motion for summary judgment and her response in opposition to the defendant's motion for summary judgment focus exclusively on her allegations of hostile work environment and retaliation.  Accordingly, the defendant's motion as to this claim should be granted without opposition from Anderson.  In any event, her discrimination claims fail for the reasons discussed below.

[7] The fourth element has also been described as "different treatment from similarly situated employees outside the protected class."  Giles v. Nat'l R.R. Passenger Corp., 59 F.4th 696, 703-04 (4th Cir. 2023) (citing Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010)).

[8] Case law recognizes exceptions to the need to prove the fourth element, but none applies here.  See Miles, 429 F.3d at 486-89.

allegation of bonus disparity and her termination. To the extent that Anderson is attempting to rely on any other actions for this claim, the court agrees that they would fail as a matter of law because none of the other purported actions constitutes an adverse employment action. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) ("[An] adverse employment action is a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.") (citation and internal quotation marks omitted); see also Muldrow v. City of St. Louis, 601 U.S. 346, 355 (2024) (emphasizing that for an alleged adverse employment action an employee must "*show some harm respecting an identifiable term or condition of employment*" and that the harm does not have to be "significant . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar") (abrogating Fourth Circuit precedent requiring the heightened standard). Only Anderson's termination and allegation of bonus disparity are actions that affect an identifiable term or condition of employment, and as to both of these actions, Quartz does not appear to challenge Anderson's ability to meet the *prima* facie test for the purposes of its summary judgment motion. (See Def.'s Mot. Summ. J. at 21, ECF No. 105 at 21) ("Anderson cannot establish all the elements of a *prima facie* case for her race discrimination claim except as to her bonus and employment termination.").

### ii.    *Prima Facie* Test (Retaliation).

To establish a *prima facie* test of retaliation, a plaintiff must show: (1) she engaged in a protected activity; (2) her employer took an adverse action against her; and (3) a causal connection existed between the protected activity and the adverse action. See Noonan v. Consol. Shoe Co., Inc., 84 F.4th 566, 574 (4th Cir. 2023) (Title VII & EPA); Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 217 (4th Cir. 2016). Further, unlike discrimination claims, "retaliation claims

must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013); cf. Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (observing that the "but-for causation requirement [for retaliation claims] is stricter than the 'lessened causation standard' for discrimination claims under which a plaintiff need only show that 'race, color, religion, sex, or national origin was a motivating factor' for an adverse action by an employer") (citing Nassar, 570 U.S. at 360 and 42 U.S.C. § 2000e-2(m)). Quartz challenges Anderson's ability to meet the second element of the *prima facie* test.

To establish the second element of the *prima facie* test for retaliation, a plaintiff must show that the adverse action was objectively material. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). The United States Supreme Court has held in the context of Title VII that, unlike the adverse employment action element for a disparate treatment claim, the prohibition of adverse actions taken in retaliation for protected activity "is not limited to discriminatory actions that affect the terms and conditions of employment." Id. at 64. Rather, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67. However, the anti-retaliation provision does not shield an employee from all retaliation, but rather only from retaliation that produces injury or harm. Id. Accordingly, to fall within the provision's protection, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). A plaintiff must show material adversity to separate the significant harms from the trivial, as federal anti-discrimination

statutes do "not set forth 'a general civility code for the American workplace.' " White, 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  The test is an objective one and considers the reactions of a reasonable employee.  White, 548 U.S. at 68. Further, "[c]ontext matters," and the significance of the adverse action must be analyzed under the circumstances particular to the plaintiff.  See id. at 69.  Thus, "an 'act that would be immaterial in some situations is material in others.' "  Id. (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 661 (7th Cir. 2005)).  The standard analyzes the challenged retaliatory act, not the underlying conduct that gave rise to the complaint of discrimination.  White, 548 U.S. at 69.  The question is whether the challenged action was material from the perspective of a reasonable person in the plaintiff's position.  Id. at 69-70.

Neither the reporting by Anderson's supervisor of issues, complaints, or grievances about Anderson to Chen, who was acting in a Human Resources capacity, nor the handling of Anderson's use of the office's back door and complaint the next day, meet the standard under White.  Cf. Thorn v. Sebelius, 766 F. Supp. 2d 585, 593, 603 (D. Md. 2011), aff'd, 465 F. App'x 274 (4th Cir. 2012) (finding that a letter of counseling for plaintiff's failure to follow supervisory instructions and warning of further disciplinary action if he did not improve was not materially adverse); Cepada v. Bd. of Educ. of Baltimore Cnty., 814 F. Supp. 2d 500, 515 (D. Md. 2011) (finding allegations that "[a plaintiff] was yelled at for complaining about his discriminatory treatment," criticized for contacting his State Delegates, and threatened with official reprimand if "he sent more complaining e-mails to administrators" were not materially adverse actions); Sherer v. Publix Super Markets, No. 2:23-cv-00275-BHH-MHC, 2024 WL 4186084, at *9 (D.S.C. July 29, 2024) (" 'Courts in the Fourth Circuit have generally found that actions which essentially amount to criticism of an employee such as performance evaluations, reprimands or warnings, and counseling

are alone insufficient to constitute materially adverse employment actions under the White standard.' ") (quoting Cornelius v. McHugh, No. 3:13-cv-018-CMC-PJG, 2015 WL 5012843, at *8 (D.S.C. Aug. 21, 2015) (collecting cases)). At most, these are the types of "petty slights and minor annoyances that often take place at work and that all employees experience," but do not rise to the level of adverse actions. White, 548 U.S. at 68; Kinloch v. Int'l Longshoremen's Ass'n Loc. 1422, No. CV 2:23-03640-BHH-MGB, 2025 WL 2917965, at *13 (D.S.C. July 24, 2025) (finding that Plaintiff's general claims of criticism, scrutiny, and rudeness "plainly do[] not rise to the level of a materially adverse action in the Fourth Circuit") (collecting cases), report and recommendation, adopted by 2025 WL 2682384 (D.S.C. Sept. 19, 2025). These alleged actions cannot be considered materially adverse under White, and cannot form the basis for any retaliation claim.

### iii.     Legitimate, Nondiscriminatory Reason/Pretext (discrimination and retaliation claims)

With respect to the alleged bonus disparity and Anderson's termination, Quartz offers a legitimate nondiscriminatory reason for the acts.

As to the bonus disparity claim, the court finds Anderson's argument regarding this event perplexing. All of the records of Anderson's co-workers' bonuses have been supplied in support of summary judgment without any suggestion of inaccuracy in the record. (See ECF No. 105-36.) Anderson began her employment in April 2022 and received her first bonus in October 2022 ($1,000) and subsequent bonuses as follows: January 2023 ($2,000), April 2023 ($3,000), July 2023 ($3,000), October 2023 ($2,000). Brantmeier began her employment in January 2020 (over two years before Anderson) and received his first bonus in October 2020 ($700). Her bonuses increased and, during the time she overlapped with Anderson, she received the following: October 2022 ($4,500), January 2023 ($4,500), April 2023 ($3,000), July 2023 ($4,000), October 2023

($2,500). Li began his employment in April 2021, but he did not receive his first bonus until February 2022 ($2,000), and did not receive a bonus after July 2022. LeBron began her employment in May 2023 and received her first bonus in October 2023 ($1,000), which was the only occurrence of LeBron's receiving a bonus while Anderson was employed. Docos began his employment in February 2023 and never received a bonus during his employment.

Quartz explains that the bonuses were discretionary and that employees usually did not receive a bonus during their probationary period. Further, although there was no formula for bonuses, they were decided by Quartz President Daniel Wang and Sandy Chen in consultation with the employee's supervisor. The general rule was that a quarterly bonus is approximately half of a month's salary and was adjusted based on tenure and performance. (Chen Decl., ECF No. 105-36 at 1-2.)

As noted above, while Anderson initially asserted in her Complaint that her second bonus, which occurred in January 2023, was lower than that of Brantmeier (who had been with the company over two years longer than Anderson), her argument has now shifted to comparing her bonus with Li's and LeBron's. However, neither of these employees ever received a higher bonus than Anderson in any month that she received a bonus. Accordingly, there is no factual support for this claim, and, in any event, Quartz has offered a legitimate, nondiscriminatory explanation for the bonuses awarded. Anderson has failed to forecast any evidence establishing that Quartz's proffered reason was pretextual or that the bonuses were even disparate from Li's and LeBron's.

As to Anderson's termination, Quartz contends that Anderson's employment was terminated for her failure to sign the Revised Handbook and the NDA. In support, it forecasts evidence that Anderson was repeatedly asked to sign the Revised Handbook and that she was informed that if she did not sign the Revised Handbook she would be terminated. Although the

Revised Handbook is dated March 2023, the evidence shows that the employees were instructed on December 29, 2023 to sign the Revised Handbook by January 4, 2024. On January 2, 2024, Tolbert emailed Anderson instructing her to sign the NDA by January 4, 2024 as well. (ECF No. 105-22.) On January 2, 2024, Human Resources emailed Anderson directly asking her to sign the Revised Handbook, to which Anderson stated that the "the handbook does not apply to me" and that she "do[es] not feel comfortable signing this document" based on the handling of her retaliation complaints. (ECF No. 105-23.) The employer has also put forth evidence that Anderson was asked to sign the NDA as well and refused. (Unemployment Hearing Tr. 25-26, ECF No. 105-34 at 25-26) (documenting Anderson's testimony that she would not sign the NDA because it contained too many grammatical errors and the ongoing situation with the company made her very reluctant to sign it). Anderson now asserts that she was not told she would be terminated for failing to sign the NDA and ultimately offered to sign it, but this dispute is immaterial in the face of the undisputed fact that she refused to sign the Revised Handbook. (Pl.'s Resp Opp'n Summ. J. at 23, ECF No. 113 at 23; Anderson Decl. ¶ 39, ECF No. 113-1 at 8; Pl.'s Dep. 118, ECF No. 105-25 at 43.) Even accepting as true that Anderson offered to sign the NDA, Quartz also offered the consistent, independent, legitimate, nondiscriminatory reason that it terminated her for failing to sign the Revised Handbook.

Accordingly, Anderson must ultimately show that this asserted reason for terminating her—failing to sign the Revised Handbook—was a pretext to terminate her based on her race or in retaliation for her protected activity. Anderson's arguments center on issues that she had with language in the Revised Handbook concerning the handling of, and process for, complaints of unlawful conduct as an explanation for why she could not or would not sign it. She also argues that Quartz's reasons for her termination have shifted because Anderson alleges that Quartz offered

a third reason ("lack of work"), in addition to the above two, during her application for unemployment benefits (Pl.'s Resp. Opp'n Summ. J. at 28, ECF No. 113 at 28),[9] and because Quartz has submitted evidence of her performance issues in support of its motion for summary judgment.[10]  However, the record compels the conclusion that Quartz never offered Anderson's performance as a basis for termination and has consistently included her failure to sign the Revised Handbook as a reason for termination.  None of Anderson's arguments suggests that this reason was pretextual.  See Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) ("[W]hen an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."); Addison v. CMH Homes, Inc., 47 F. Supp. 3d 404, 420 (D.S.C. 2014) ("An employer's expectations of its employees are considered 'legitimate' when they are honestly held; whether the employee agrees with those expectations is not the test. . . .  As long as the requirements imposed are bona fide expectations, it is not the court's province to determine whether an employer demands too much of its workers.").

---

[9] Although Anderson raises this argument citing to Exhibit 35 for this proposition, the court notes that there does not appear to be an Exhibit 35 in the record.  There is only a placeholder for it.

[10] To the extent that Anderson relies on temporal proximity in her assertion of pretext, this argument fails as a matter of law.  While very close temporal proximity can create an inference of retaliation, it alone is generally insufficient to show pretext.  Jones v. United Health Grp., Inc., 802 F. App'x 780, 783 (4th Cir. 2020) (stating that "temporal proximity, without more, does not support a finding of pretext").  Further, to the extent she challenges the defendant to prove that everyone else signed the Revised Handbook, it is her burden to present evidence of a similarly situated employee who refused to sign the Revised Handbook and was not terminated.  (Compare Pl.'s Resp. Opp'n Summ. J. at 24, ECF No. 113 at 24 (disputing that no other employees refused to sign the Revised Handbook or NDA since the defendant did not produce the signed documents of her co-workers) with Jiang Decl. ¶ 32, ECF No. 105-1 at 7 (declaring that "[n]o other Quartz employees refused to sign the Handbook or Non-Disclosure Agreement.").

Thus, the court finds that Quartz has proffered legitimate, nondiscriminatory reasons for the bonuses awarded to Anderson and for terminating Anderson.   Anderson has failed to forecast sufficient evidence to demonstrate Quartz's reason was a pretext for retaliation or that retaliating against Anderson for engaging in protected activity under Title VII was the but-for cause of her termination.[11]   Cf. Reeves, 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated.").   The defendants are therefore entitled to summary judgment as to Anderson's discrimination and retaliation claims.

### c.    Hostile Work Environment

Under the McDonnell Douglas framework, to establish a *prima facie* case of a hostile work environment, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's protected characteristic; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.  See Perkins v. Int'l Paper Co., 936 F.3d 196, 207-08 (4th Cir. 2019); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015); see also Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (providing that the elements for a hostile work environment claim "are the same under either § 1981 or Title VII").  "A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult

---

[11] Although not argued in Plaintiff's motion for summary judgment or her response in opposition to the defendant's motion for summary judgment, to the extent that Anderson is asserting that issuing her performance improvement plan ("PIP") was a retaliatory act (see Pl.'s Dep. 111-113, ECF No. 105-25 at 39-41; PIP, ECF No. 105-33), the defendant has likewise put forth legitimate, nondiscriminatory reasons for this thirty-day PIP. (Def.'s Mot. Summ. J. at 6-10, ECF No. 105 at 6-10) (summarizing issues leading up to the PIP.)  Although Anderson quibbles with the defendant's positions regarding some of her attendance and performance, Anderson has failed to forecast any evidence that placing her on a PIP for performance deficiencies was a pretext for retaliatory animus.

that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Boyer-Liberto, 786 F.3d at 277 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

In support of her claim of hostile work environment, Anderson appears to argue that she was the only African-American employee, and that other employees were not reported to Human Resources. (Pl.'s Dep. 103, 142-143, ECF No. 105-25 at 33, 48-49.) She testified that the alleged harassment began after she hosted a Christmas party for China Jushi USA (Quartz's landlord) in December 2022. (Id. 165.) Anderson's evidence that Tolbert created a hostile work environment is that Tolbert reported her actions to Human Resources and forwarded the email in which Anderson reported that two coworkers were using the back door and asked if the policy applied to all employees or applied only to her. (Pl.'s Dep. 97, 151-53, 155, ECF No. 105-25 at 29, 53-56.) In her motion for summary judgment, Anderson argues that she was "isolated, disrespected in front of peers, denied private meetings with HR, and ultimately terminated in a group meeting that included a non-supervisory employee." (Pl.'s Mem. Supp. Summ. J. at 3, ECF No. 104-1 at 3.)

Quartz challenges Anderson's ability to satisfy the second and third element of the *prima facie* test. Upon review, the court agrees that Anderson has failed to forecast evidence to meet these required elements.

**Second Element.** " 'Title VII does not prohibit all verbal or physical harassment in the workplace'—it is directed only at actions that occur 'because of' one of the protected statuses." Strothers v. City of Laurel, Md., 895 F.3d 317, 329 (4th Cir. 2018) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). "In determining whether offensive conduct can be attributed to discrimination against the employee's race or other protected status, courts must view the behavior in light of the social context surrounding the actions." Id. Here, Anderson has failed

Page 21 of 25

to present evidence from which a jury could reasonably find that any of the unwelcome conduct experienced by Anderson was *based on her race*. None of the actions she complains about was overtly race-based. Rather, all of the purported harassment that Anderson relies upon in support of this claim was neutral on its face. Accordingly, the court has reviewed the conduct while considering the social context surrounding it.

Anderson's sole argument that her purported harassment was based on her race was because she was the only African-American employee and because she was the only employee who was repeatedly reported to Human Resources and subjected to the above-described harassment. Making all reasonable inferences in Anderson's favor, these arguments are speculative at best. The undisputed evidence shows that Tolbert expressed criticism and issues with at least two of Anderson's non-black co-workers as well, who ultimately chose to resign. (Cf. Email for LeBron from Tolbert, ECF No. 113-2 at 9 (informing LeBron of a verbal warning, detailing performance issues and requiring performance improvement or disciplinary action may occur); LeBron Resignation, ECF No. 113-2 at 10; Li Warning Email from Tolbert dated 10/25/2022 (copying Human Resources and others on a verbal warning to Li of negligence of duty and stating that Tolbert "would prefer not to reach the next step"); Resignation Letter from Li to Tolbert also dated 10/25/22 (stating in part that they will not be able to resolve their differences, mentioning the lack of flexibility, being ridiculed for "not knowing better," and the presence of "passive-aggressive retaliation")). Accordingly, no reasonable jury could find that Tolbert singled out Anderson as the only African-American employee or could conclude from this limited evidence that Tolbert's alleged hostile treatment of Anderson was based on racial animus. See McIver v. Bridgestone Americas, Inc., 42 F.4th 398, 409 (4th Cir. 2022) (providing that harassment based on race may be inferred when the plaintiff experienced it more often than others

of different races or suffered a kind likely to be motivated by race, "[b]ut a plaintiff cannot rely on her own 'conjecture' to impute a racial character to what appears to be neutral harassment"); Strothers, 895 F.3d at 330-31 (stating "harassment need not be accompanied by a contemporaneous statement of animus to be actionable under Title VII—rather, the connection between animus and conduct may be inferred from the totality of the circumstances").  Thus, the totality of the circumstances relating to Tolbert simply does not reasonably permit such a conclusion.  Anderson has therefore failed to forecast evidence to satisfy the second element of the *prima facie* test.

**Third Element.**  As stated above, the third element of the *prima facie* test for hostile work environment requires that the harassment be "sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere."  Perkins, 936 F.3d at 207-08. This element has both a subjective and objective component; therefore, in addition to Anderson showing that she perceived the environment to be abusive or hostile, she must also show that a reasonable person would perceive the same.  Id. at 208.  This element has been described as a "high bar."  E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than 'rude treatment by [coworkers],' 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor,' are not actionable under Title VII.") (citations omitted, alterations in original).  Ultimately, none of the alleged actions taken against or towards Anderson suggests severe or pervasive abuse constituting a hostile work environment. See Decoster v. Becerra, 119 F.4th 332, 338 (4th Cir. 2024) (finding that a plaintiff's allegations that her supervisor "humiliated her by 'frequently singl[ing] [her] out in front of her colleagues

and peers and accus[ing] her of failing in her position,' 'sp[eaking] to [her] with contempt,' 'frequently treat[ing] her with disdain,' blaming her for issues within the work organization that were out of her control, threatening to fire her once, providing her with a [Letter of Expectation], and placing her on an [Opportunity to Demonstrate Acceptable Performance plan]" were insufficient to establish severe or pervasive conduct) (alterations in original); Holloway v. Maryland, 32 F.4th 293, 301 (4th Cir. 2022) (finding that a plaintiff's allegation that his supervisor refused to communicate directly with him; surveyed employees as to the plaintiff's leadership and whereabouts during the workday; criticized his leadership in meetings; scheduled a meeting before his start time and during that meeting yelled at him, slammed documents onto a table, and required the plaintiff to address him as "sir"; required the plaintiff to sign a disciplinary evaluation or be considered insubordinate; and "did not honor [the plaintiff] at an employee-recognition program" were insufficient to establish severe or pervasive conduct). Anderson's examples of Tolbert's reporting Anderson to Human Resources or otherwise criticizing her work behavior, as well as sharing with co-workers her communications with Tolbert, cannot meet this element.

Based on the foregoing, Anderson has failed to meet the *prima facie* test for a racially hostile work environment, and Quartz is entitled to summary judgment on this claim.

## RECOMMENDATION

Based on the foregoing, the court recommends that Quartz's motion for summary judgment (ECF No. 105) be granted and Anderson's motion for summary judgment (ECF No. 104) be denied. If this recommendation is adopted, the court recommends that plaintiff's remaining motions be denied as they have no merit or are moot. (ECF Nos. 79, 90, 94, 116, 119.)

January 26, 2026
Columbia, South Carolina

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

*The parties' attention is directed to the important notice on the next page.*

Page 24 of 25

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' "  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).